<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MOORISH SCIENCE TEMPLE OF AMERICA 4TH & 5TH GENERATION et al., : : : | Civil Action No. 11-7418 (RBK) |
| Plaintiff, : : | **MEMORANDUM OPINION AND ORDER** |
| v. : : |  |
| SUPERIOR COURT OF NEW JERSEY at el., : |  |
| Defendants. : |  |

This matter comes before the Court upon Plaintiff's submission of a civil complaint, <u>see</u> Docket Entry No. 1, and an application to proceed <u>in forma pauperis</u>, <u>see</u> Docket Entry No. 1-1, and it appearing that:

1. The aforesaid complaint is executed in the style indicating that the draftor(s) was/were affected by "Moorish," "Marrakush," "Murakush" or akin perceptions, which often coincide with "redempotionist" and/or "sovereign citizen" socio-political beliefs. <u>See</u> <u>Bey v. Stumpf</u>, 2011 U.S. Dist. LEXIS 120076, at *2-13 (D.N.J. Oct. 17, 2011) (detailing various aspects of said position).

> Moorish and Redemptionist Movements.  Two concepts, which may or may not operate as interrelated, color the issues at hand. One of these concepts underlies ethnic/religious identification movement of certain groups of individuals who refer to themselves as "Moors," while the other concept provides the basis for another movement of certain groups of individuals, which frequently produces these individuals' denouncement of United States citizenship, self-declaration of other, imaginary

"citizenship" and accompanying self-declaration of equally imaginary "diplomatic immunity."

[a]. Moorish Movement

In 1998, the United States Court of Appeals for the Seventh Circuit - being one of the first courts to detail the concept of Moorish movement, observed as follows:

> [The Moorish Science Temple of America is a] black Islamic sect . . . . [T]hree-fourths of its temples (congregations) are inside prisons. The Moors, as adherents to the Moorish Science Temple are called, have their own version of the Koran and a list of prophets that includes, in addition to the prophets recognized by orthodox Islam, Buddha, Confucius, and the founder . . . of the Moorish Science Temple . . . . Two groups vie for leadership of the sect: one in Mt. Clemens, Michigan, headed by [someone referred to as] Grand Sheik/Moderator Brother R. Love-El, and one in St. Louis headed by [someone referred to as] Grand Sheik Jerry Lewis-Bey. (The suffixes "El" and "Bey" refer to the African tribes from which the Moors believe black people are descended.)

Johnson-Bey v. Lane, 863 F.2d 1308, 1309 (7th Cir. 1998).[1]

[b]. "Redemptionism," "Paper Terrorism" and Related Concepts

Shortly after the concept of Moorish movement was outlined by the Seventh Circuit, discussions of another movement appeared on the pages of legal opinions issued by the federal judiciary; that other movement was dubbed as "sovereign citizenship" movement. This movement was fostered by

> a loosely organized collection of groups and individuals who have adopted a right-wing anarchist ideology originating in the theories of a group called the Posse Comitatus in the 1970s. Its adherents believe that virtually all existing government in the United States is illegitimate . . . . [Therefore, such] "sovereign citizens" wage war against the government and other forms of authority using "paper

---

[1] The underlying term "Moors" seemingly reflects the adherents' interest in highlighting their actual or alleged "ancestry in ancient Moors, i.e., the seventeenth century Muslims of the Islamic Iberian Peninsula and North Africa, who were of Berber and Arab descent." Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, at *4, n.1 (D.N.J. July 30, 2009).

terrorism" harassment and intimidation tactics, and occasionally resorting to [physical] violence.

Sovereign Citizen Movement, Anti-Defamation League, at <<http://www.adl.org/Learn/ext_us/SCM.asp?LEARN_Cat=Extremism&LEARN_SubC at=Extremism_in_America&xpicked=4&item=sov>> (visited on Mar. 31, 2011).[2] Consequently, a decade after the Seventh Circuit's issuance of Bey v. Lane, the United States Court of Appeals for the Third Circuit noted a stream of government actions aimed at controlling the "paper terrorism" activities of sovereign citizens, which - by then - matured into a wide-spread criminal scheme, where the scheme participants' "self-legitimized" their names for the purposes of initiating fraudulent legal transactions. The Court of Appeals explained:

---

[2] The concept of "sovereign citizenship" does, occasionally, relate to the phenomenon of "world passports." "World passports," issued by the so-called World Service Authority ("WSA"), are not recognized, in the United States and in the majority of world nations, as substitutes to official documents, such as national passports or drivers' licenses. See, e.g., Eugenio J. Huot Calderon, The Concept of Puerto Rican Citizenship, 35 Rev. D.P. 321, 333-36 (1996); <<http://web.archive.org/web/20080307015819/http://foia.state.gov/masterdocs/07fam/07m1310.pdf>>. A former-World-War-II-bomber-pilot-turned-peace-activist Garry Davis created the WSA in 1953 after renouncing his U.S. citizenship and gaining notoriety by picketing the United Nations to argue that world peace requires a global government rather than a system of nation-states. See Daniel Engber, What's a World Passport? Slate Mag. (Mar. 24, 2006). The WSA has been promoting "world citizenship" by issuing documents largely similar in their appearance to regular national passports, which the WSA called "world passports," to any person who wanted to declare himself/herself "a citizen of the world." One can inexpensively obtain such "passport" by filling out an application form at the WSA website. See <<http://www.worldgovernment.org/>>. Therefore, while some persons just denounce their United States citizenship under the claim of sovereign citizenship, see, e.g., Roche v. Attorney General, 420 Fed. App'x 124, 2011 U.S. App. LEXIS 5773, at 1-2, nn. 1 and 2 (3d Cir. 2011), others accompany their denouncements of United States citizenship by applications for "world passports" and attempts to use these passports as legally cognizable documents, sometimes for the purposes of perpetrating criminal schemes in the United States. See, e.g., Asghar v. State, 698 N.E.2d 879 (Ind. Ct. App. 1998). Moreover, a person's denouncement of his/her United States citizenship (being occasionally accompanied by the person's obtaining of a "world passport") frequently produces a peculiar "side effect" in the form of that person's self-grant of alternative, imaginary citizenship which, in turn, results in that person's insistence upon his/her "diplomatic immunity" for the purposes of United States law or, better say, for the purposes of the "grantee's" attempts to avoid the reach of law. See, e.g., U.S. Dist. Court v. Ephriam, 2009 U.S. Dist. LEXIS 103284 (D. Kan. Nov. 4, 2009).

> Evidently, [adherents of this scheme have been] filing [fraudulent] financing statements under Article 9 of the UCC, which sets forth a process for perfecting security interests in property.  These liens and judgments, accessible on financing statement forms, are easy to file. Once registered, however, the fraudulent liens are very burdensome to remove. For example, in a New Jersey incident, [one group] registered a fraudulent $ 14.5 million lien with the New Jersey Department of Revenue against a federal prosecutor and a $ 3.5 million lien against a federal judge for using [the group participants'] "copyrighted" names in court papers and hearings . . . . [Adherents of this scheme] have filed these commercial liens with state departments of revenue, departments of state, or other the state agencies responsible for receiving and recording these financial instruments. Further investigation revealed that various publications were advocating the exploitation of the UCC filing process and provided explicit instructions on how to perfect these fraudulent security interests, including sample financing statements forms.  [These publications built on] the "Redemptionist" theory, which propounds that a person has a split personality: a real person and a fictional person called the "strawman."  . . .  Redemptionists claim that government has power only over the strawman and not over the live person, who remains free [and, thus,] individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, [pursuant to this "theory,"] the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of prisoners, to keep him in custody.  If government officials refuse, [adherents of this scheme] file liens against [government officials] . Adherents of this scheme also advocate that [they] copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

Monroe v. Beard, 536 F.3d 198, 203 and nn. 3 and 4 (3d Cir. 2008); accord Roche, 420 Fed. App'x 124, 2011 U.S. App. LEXIS 5773, at 2 (noting that the "sovereign citizen" litigant elected to present the district court's dismissal of his petition as a "contract" between the court and the litigant).

The "strawman" concept is, occasionally, presented/exploited somewhat differently by those redemptionists who claim that - at the moment of their denouncement of United States citizenship and/or their accompanying self-grant of imaginary alternative citizenship - their "strawman" incarnation became "deceased," and their live persons quasi-expatriated from the U.S. (while continuing their actual physical residence in the United States).  In connection with this odd quasi-expatriation scheme, such redemptionists often claim that their live persons: (a) hold "estates" in the form of actual physical bodies of their respective  "quasi-deceased" strawmen;[3] and (b) reside in geographic locales "self-claimed away" from the United States.

[c].     Interplay Between Moorish and Sovereign Citizenship Movements

It does not appear that one's Moorish ethnic roots (or Moorish religious convictions, or both) have any reason to go hand-in-hand with one's adhesion to the sovereign citizenship movement (or with one's professing the theory of redemptionism, or with one's practice of "paper terrorism," claims of self- granted "diplomatic immunity," etc.).  However, and unfortunately enough, certain groups of individuals began merging these concepts by building on their alleged ancestry in ancient Moors (and/or on their alleged or actual adhesion to Moorish religious convictions) for the purposes of committing criminal offenses and/or initiating frivolous legal actions on the grounds of their self-granted "diplomatic immunity," which these individuals deduce either from their self-granted "Moorish

---

[3]  This "estate" concept is legally deficient on its face. As one court explained,

[such] "estates" of [litigants] cannot qualify as [actual] litigants since [these "estates"] offer no order by a probate court acknowledging the existence of these "estates" and, indeed, it would be surprising had such order been entered because it is well established that the body of a decedent cannot be an estate, or even a part of an estate.  See Greneker v. Sprouse, 263 S.C. 571, 574, 211 S.E.2d 879 (1975) (clarifying that the estate is limited to the real and personal property of a decedent); see also In re Estate of Medlen, 286 Ill. App. 3d 860, 864, 677 N.E.2d 33, 222 Ill. Dec. 220 (Ill. App. Ct. 1997) (explaining that "there is no property right in a dead body, and the body forms no part of the decedent's estate . . ." and citing 22A Am. Jur. 2d Dead Bodies §§ 2 and 3 and In re Estate of Fischer, 1 Ill. App. 2d 528, 535, 117 N.E.2d 855 (Ill. App. Ct. 1954)); In re Estate of Moyer, 577 P.2d 108, 110 (Utah 1978) (same); Snyder v. Holy Cross Hospital, 30 Md. App. 317, 352 A.2d 334 (Md. App. Ct. 1976) (same).

Estate of Casimir v. New Jersey, 2009 U.S. Dist. LEXIS 78113, at *9 (D.N.J. Aug. 31, 2009).

      citizenship" and from their correspondingly-produced homemade "Moorish" documents (or from correspondingly-obtained "world passports") or from a multitude of other, equally non-cognizable under the law, bases, which these individuals keep creating in order to support their allegations of "diplomatic immunity."[4]

      Murakush-Amexem, 790 F. Supp. 2d 241, 2452-12 (footnotes in original).

2.    Deficiencies seemingly ensuing from such "Moorish/Marrakush" style of submission mired the pleading and in forma pauperis ("IFP") application currently before the Court. Specifically, the "plaintiff" named in this mater is "Moorish Science Temple of America 4th & 5th Generation"; that "plaintiff" is, apparently, being "represented" by a person who designated himself/herself by using the alias "Attorney In Fact: Minister C-R Ma'at El-Bey" and – to add another lawyer of "representation" stated that he/she was not suing on his/her own behalf, but rather on behalf of the "estate" of a certain "Chester R. Jenkins, Jr." See Docket Entry No. 1, at 1. Since the entirety of this, rather voluminous, submission indicates that "Chester R. Jenkins, Jr." is not a deceased, and the submission

---

[4] Such claims of "diplomatic immunity" are without merit. As it was already observed,

> [Plaintiffs err in conflating their] expatriation and [diplomatic] immunity arguments, since: (a) Plaintiffs seem to focus on an irrelevant fact that anyone may renounce his/her United States citizenship, but this fact in no way establishes that Plaintiffs actually expatriated in accordance with the applicable legal requirements, see, e.g., Memorandum Opinion for the Solicitor General of June 12, 2000, . . . ; Marks v. Esperdy, 315 F.2d 673 (2d Cir. 1963) . . . ; and (b) even if the Court were to hypothesize that Plaintiffs duly expatriated, the fact of expatriation has no effect on the state court's jurisdiction to conduct Plaintiffs' criminal proceedings. See, e.g., Cohen v. Little Six, Inc., 543 N.W.2d 376 (Minn. Ct. App. 1996); see also Cara S. O'Driscoll, The Execution of Foreign Nationals in Arizona, 32 Ariz. St. L.J. 323 (2000); [accord] Casanova v. Fitzpatrick, 214 F. Supp. 425 (S.D.N.Y. 1963) . . . .

Casimir, 2009 U.S. Dist. LEXIS 78113, at *19, n. 8 (parenthetical explanations omitted).

suggests that "Chester R. Jenkins, Jr." has undergone bankruptcy proceedings, this Court surmises that the reference to Chester R. Jenkins, Jr.'s "estate" was made either in connection to the "estate" adjudicated in Chester R. Jenkins, Jr.'s bankruptcy proceedings or in connection to Chester R. Jenkins, Jr.'s decision to adopt "redemptionist" position and declare himself the "inheritor" of his own physical body.  Granted that the submission at bar seems to challenge a certain finding made by the Family Part of the New Jersey Superior Court, Law Division, and that finding dealt with parental rights rather with distribution of any bankruptcy estate, the presumption that Chester R. Jenkins, Jr. self-declared himself to be an "estate" (upon his decision to adopt "redemptionist" position and to deem himself the "inheritor" of his own physical body) appears more plausible.[5]  Read backwards, this multi-layered designation of "plaintiff" indicates that "Chester R. Jenkins, Jr." is the "real" plaintiff in this matter, the sense of him being the party claiming to be aggrieved by the decisions entered by the New Jersey Superior Court, Law Division, while his "estate" is a fictitious derivative entity that should be ignored just like this "estate's" representatives, namely, "Minister C-R Ma'at El-Bey" and/or "Moorish Science Temple of America 4th & 5th Generation."

3. Under the "next friend" doctrine, standing is allowed to a third person so this third person could file and pursue a claim in court on behalf of someone who is unable to do so on his or her own.  The doctrine dates back to the English Habeas Corpus Act of 1679 and provides a narrow exception to the "case or controversy" requirement set forth in the Article III of Constitution.  See Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990).

---

[5] If so, any reference to such "estate" is frivolous and qualifies as mockery of the Court.

The Whitmore Court set out two requirements that should be met by the one seeking to qualify for "next friend" standing: (1) "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf [(s)he] seeks to litigate" (and it has been suggested that a "'next friend' must have some significant relationship with the real party in interest"); and (2) "the 'next friend' must provide an adequate explanation — such as inaccessibility, mental incompetence, or other disability — why the real party in interest cannot appear on his own behalf to prosecute the action." Id. at 163-64.  Since Witmore, the Supreme Court further elaborated the standing requirements of Article III in terms of a three-part test, i.e., whether the plaintiff can demonstrate an injury in fact that is fairly traceable to the challenged actions of the defendant and likely to be redressed by a favorable judicial decision.  See Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 102-103 (1998).  However, "the point has always been the same: whether a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" Id., at 103 n. 5 (quoting Warth v. Seldin, 422 U.S. 490, 508 (1975)); see also, Sprint Communs. Co., L.P. v. APCC Servs., 554 U.S. 269, 301 (2008) (Roberts, J., dissenting) ("The absence of any right to the substantive recovery means that respondents cannot benefit from the judgment they seek and thus lack Article III standing. 'When you got nothing, you got nothing to lose'") (quoting, with correction of grammar, Bob Dylan, Like A Rolling Stone, in On Highway 61, Revisited (Columbia Records 1965)).  Here, it is self-evident that "Minister C-R Ma'at El-Bey" cannot proceed jus tertii on behalf of Chester R. Jenkins, Jr. since the Court neither has any information about the relationship between

    these persons nor has any basis to deem Chester R. Jenkins, Jr. meantally incapacitated to pursue his own claims.

4.     The fact that "Minister C-R Ma'at El-Bey" elected to refer to himself/herself as "attorney in fact" changes nothing for the purposes of this Court's analysis.

> "In all courts of the United States the parties may plead and conduct their own cases personally or by *counsel* as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." 28 U.S.C. § 1654 (emphasis supplied). . . . While a duly licensed attorney may [operate as] a law firm, see Puckett v. McPhillips Shinbaum, LLP, 2008 U.S. Dist. LEXIS 26215 (M.D. Ala. Mar. 31, 2008), [an entity self-designating itself as a "law firm"] cannot qualify as "counsel" . . . A fortiori, an entity not qualified as an actual law firm cannot represent anyone in the court of law. Similarly, a person not duly admitted to legal practice but merely self-describing himself as an attorney . . . cannot act as an attorney to any juridical entity or natural person in the court of law; he can only act as his own counsel. Hence, [no self-designated "attorney"] may represent any [plaintiff unless] he is an attorney duly admitted to practice in this District; otherwise, [the party] can act only represent himself. Accord Local Civil Rule 11.1 ("In each case, the attorney of record who is a member of the bar of this Court shall personally sign all papers submitted to the Court or filed with the Clerk").

Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, at *94-95 (D.N.J. July 30, 2009). Since "Minister C-R Ma'at El-Bey" neither provided this Court with any verifications of his/her admission to practice in this District, and this Court's official records of admitted counsel contain no reference to "Minister C-R Ma'at El-Bey," "Minister C-R Ma'at El-Bey" cannot act as Chester R. Jenkins, Jr.'s legal counsel. In the same vein, "Moorish Science Temple of America 4th & 5th Generation" cannot act as "Chester R. Jenkins, Jr.'s" counsel, since that entity is not an admitted attorney.

5.     Furthermore, while Chester R. Jenkins, Jr., being a natural person, can litigate his claims IFP, no "estate" of Chester R. Jenkins, Jr. can proceed in a legal action in forma pauperis.

To start, if "Chester R. Jenkins, Jr.'s" estate is a figment of his imagination, resulting from his position that, upon becoming a redemptionist, he became "deceased" and "inherited" his physical body, "Chester R. Jenkins, Jr.'s estate" is simply not in existence as a juridical entity.  See Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, at *96-97 ("In order to be a litigant in legal proceedings, the litigant -- regardless of whether it is a juridical entity or a natural person -- must actually exist.  'It is elemental that in order to confer jurisdiction on the court the plaintiff must have an actual legal existence, that is he or it must be a person in law or a legal entity with legal capacity to sue.  [The plaintiff cannot be deemed existing if it] is neither a natural nor artificial person, but is merely a name'") (quoting Isaac v. Mount Sinai Hospital, 3 Conn. App. 598, 600, 490 A.2d 1024, cert. denied, 196 Conn. 807, 494 A.2d 904 (1985), and citing De Paul Community Health Center v. Trefts, 688 S.W.2d 379 (Mo. Ct. App. 1985)). Moreover, even if "Chester R. Jenkins, Jr.'s estate" is not a product of imagination but a result of a valid bankruptcy proceeding, "Chester R. Jenkins, Jr.'s estate" cannot prosecute any case IFP because "no juridical entity can qualify as pauper under Section 1915, under any set of circumstances."  Murakush Caliphate of Amexem Inc. v. New Jersey, 790 F. Supp. 2d at 265 (citing Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, and United States v. McQuade, 647 F.2d 938, 940 (9th Cir. 1981), cert. denied, 455 U.S. 958 (1982)).  Simply put, the only person who has standing to submit a complaint about his alleged injuries and who can prosecute that complaint IFP is Chester R. Jenkins, Jr. himself.

IT IS, THEREFORE, on this ___12th___ day of ___January___, 2012,

ORDERED that Plaintiff's complaint, Docket Entry No. 1, being a document executed by "Minister C-R Ma'at El-Bey" and/or "Moorish Science Temple of America 4th & 5th Generation," is dismissed for lack of standing. Such dismissal is without prejudice to Chester R. Jenkins, Jr.'s filing of a civil complaint executed on his own behalf; and it is further

ORDERED that Plaintiff's application to proceed in forma pauperis is denied with prejudice, on the grounds of inapplicability of 28 U.S.C. § 1915 to claims filed by juridical entities, such as "Moorish Science Temple of America 4th & 5th Generation" or any "estate." Such denial is without prejudice to Chester R. Jenkins, Jr.'s seeking in forma pauperis status on his own behalf; and it is further

ORDERED that the Clerk shall close this action without filing the complaint or assessing a filing fee, by making a new and separate entry on the docket reading "CIVIL CASE CLOSED"; and it is further

ORDERED that the Clerk shall commence a new and separate matter, designating "Chester R. Jenkins, Jr." as "plaintiff" and "Superior Court of New Jersey et al." as "defendants," and identifying "cause" in that new matter as "42:1983 Civil Rights Act" and "nature of suit" as "550"; and it is further

ORDERED that the Clerk shall assign that new and separate matter to the undersigned; and it is further

ORDERED that the Clerk shall administratively terminate that new and separate matter by making a docket entry reading, "CIVIL CASE TERMINATED"; and it is further

ORDERED that administrative termination is not a dismissal on merits, and Chester R. Jenkins, Jr. may have that new and separate matter reopened in the event he submits, within sixty days from the date of entry of this Memorandum Opinion and Order, his own civil complaint and accompanies that complaint by his filing fee of $350 (or by his own, duly executed under penalty of perjury application to proceed in that new and separate matter in forma pauperis); and it is further

ORDERED that the Clerk shall serve this Memorandum Opinion and Order upon Plaintiff by regular U.S. mail; and it is finally

ORDERED that the Clerk shall include in the said mailing: (a) one blank application form for individuals wishing to prosecute a civil complaint in forma pauperis; (b) one blank civil complaint form (which the Court strongly urges Chester R. Jenkins, Jr. to utilize in preparation of his pleading, that is, in the event Chester R. Jenkins, Jr. elects to file a civil complaint in the new and separate matter opened for him); (c) a copy of the docket sheet created in the new and separate matter opened for Chester R. Jenkins, Jr.; and (d) a copy of the opinion docketed in Nin El Ameen Bey et al. v. Stumpf et al., Civil Action No. 11-5684 (RBK) (D.N.J.), Docket Entry No. 2 (which the Court strongly urges Chester R. Jenkins, Jr. to study carefully in order to avoid including in his pleading claims that might qualify as facially frivolous).

s/Robert B. Kugler  
**Robert B. Kugler**  
**United States District Judge**